**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

UNITED STATES OF AMERICA,

    Plaintiff,

  v.

LOUIS FAHIM SENEGAL,

    Defendant.

Case No. 2:19-cr-00062-APG-DJA

**REPORT AND RECOMMENDATION**

## I.  INTRODUCTION

Presently before the Court is Defendant Louis Senegal's Motion to Suppress all evidence found and seized as a result of a search of his residence which was filed on July 16, 2019. (ECF No. 32). Senegal argues the warrant to search the residence failed to establish probable cause because it relied on information gleaned during an illegal pre-warrant protective sweep of the residence and because it contained no facts that Senegal's business was operating in violation of Nevada law. (*Id.*)  The Government filed a Response to the Defendant's Motion on July 29, 2019. (ECF No. 33).  Senegal filed a Reply to the Response on August 8, 2019. (ECF No. 36).

The Court conducted an evidentiary hearing on September 17, 2019.  (Mins of the Proceeding (ECF No. 47)).  At the hearing the Government called three (3) witnesses: (1) Detective Daniel Weber, a Las Vegas Metropolitan Police Department (hereinafter LVMPD) detective who authored the search warrant; (2) LVMPD Detective Aaron Grays, who conducted the undercover buys that form, in part, the basis for the search warrant, and (3) LVMPD Sergeant Russ Cutolo, who was Weber's supervisor and testified regarding an addendum report which was filed over six (6) months after the conclusion of the investigation.  The Court also admitted into evidence Government's Exhibits 1, 2, 5, 6, and 8, and Defendant's Exhibit A.  The defense called no witnesses.  At the conclusion of the hearing the Court indicated it would file a written

recommendation and report and took the matter under advisement.  This report and recommendation follows.

## II.    BACKGROUND

Senegal is charged in a nine count Superseding Indictment with various crimes related to a marijuana delivery service he allegedly owned and operated (ECF No. 19).  The charges are a result of an approximately three (3) week investigation by officers from the LVMPD into the business.  The investigation involved four (4) undercover transactions wherein Detective Grays, acting in an undercover capacity, purchased relatively small amounts of marijuana from Senegal on four (4) separate occasions.  At the conclusion of the fourth transaction Senegal was arrested and detectives traveled to the apartment they had identified as Senegal's residence.  After identifying and arresting the co-defendant, Endyah Woods, while she was exiting the apartment, the officers froze the apartment and conducted a "protective sweep" of the residence "in anticipation of obtaining a search warrant" (according to the report documenting the search and the detective's testimony at the hearing) (RT p. 90)[1].  Senegal now moves for suppression of all of the evidence found during the search of the apartment as the fruits of an unlawful search. (ECF No. 32).

## III.    TESTIMONY AND EVIDENCE

a)   Initial Investigation

In November 2018, LVMPD Detective Weber was given information from a supervisor of an alleged illegal marijuana delivery business operating within the Las Vegas valley.  During that investigation Detective Weber identified Senegal as the primary subject of that investigation. Upon receiving this information, Detective Weber utilized an undercover detective to make contact with Senegal to further his investigation.  This is the first marijuana investigation on a state level that Detective Weber has ever participated in as the lead detective.

---

[1] References to the reporter's transcript of the evidentiary hearing shall be referred to as "RT" followed by the appropriate page number.

The information given to Detective Weber included a website that advertised the delivery of marijuana in the Las Vegas valley.  The website listed an address at an apartment located in a building on Cambridge Street in Las Vegas, Nevada (hereinafter "the Cambridge apartment")[2]. According to Detective Weber, there was nothing about the website itself that would indicate that it was an illegal marijuana delivery business. (RT 76).

b) First and Second Transactions

Detective Weber arranged for Detective Grays to work in an undercover capacity to purchase the marijuana through the delivery website.  On November 29, 2018, Detective Grays contacted the number on the website and arranged for the purchase and delivery of marijuana. During the telephone conversation, an individual on the other end of the telephone call agreed to meet Detective Grays at the Silver Sevens Casino located on Paradise Road in Las Vegas, Nevada.  Law enforcement set up surveillance for the controlled purchase after which Detective Grays drove to the front of the casino.  As Detective Grays arrived at the front of the casino, a black female (later identified as co-defendant Endyah Woods) was observed exiting the casino out toward the valet entrance walking over to the passenger window of Detective Grays' vehicle. Upon arriving at the vehicle, she leaned in and, after a brief period of time, turned around and walked back from the valet entrance through the casino doors back into the casino.  After the transaction, Detective Grays provided Detective Weber a pill bottle he purchased which contained a green leafy substance which later tested positive for marijuana.  Surveillance officers were only able to surveil the black female until she entered what was later determined to be a ride sharing vehicle that dropped her off at another hotel.

On December 5, 2018, Detective Grays called and made a second purchase through the marijuana delivery website.  Telephonic arrangements were again made to meet at the Silver Sevens Casino.  Other officers again set up surveillance at the casino.  On the night of that transaction, a white Dodge pulled up to the valet parking area of the casino.  An individual, later

---

[2] LR 1C 6-1 provides for redaction of a home address if it must be listed.  For this reason, the Court will refer to Senegal's apartment which is the subject of the motion to suppress as ("the Cambridge apartment").

1   identified as Senegal, called Detective Grays and told him he was there at the front of the hotel in

2   the white Dodge.  Detective Grays had a brief exchange with the individuals in the car during

3   which he purchased another pill bottle of marijuana.  At the conclusion of that purchase,

4   Detective Weber ran the license plate of the white Dodge and learned that it was registered to

5   Senegal.

6       On that same date, surveillance officers were able to watch the vehicle leave the Silver

7   Sevens Casino and eventually return to the Cambridge Street apartments and the same address

8   which was on the website.  When the vehicle entered the apartment complex, it drove to the north

9   side of the complex, pulled up alongside the curb, where a black female exited the vehicle and

10  walked towards the doors.  The vehicle continued westbound through the complex parking lot and

11  parked in a parking spot.  Because officers were unable to positively identify Senegal or the

12  female subject, they decided to conduct a third controlled buy after which they would conduct a

13  traffic stop (given that Detective Weber had previously determined the registration on the vehicle

14  was suspended).  Detective Weber testified that during the traffic stop patrol officers would be

15  able to positively identify the individuals in the vehicle.

16      c)  Third Transaction

17      The third controlled buy took place on December 13, 2018.  The transaction on this date

18  occurred almost identical to the other transactions where Detective Grays contacted the number

19  on the website, was told to meet the individuals at the Silver Sevens Casino, after which the same

20  Dodge appeared with the same black male and female inside.  After a brief exchange, where

21  Detective Grays purchased a small amount of marijuana inside a prescription pill bottle, the white

22  Dodge left the Silver Sevens Casino.  Shortly thereafter, a separate LVMPD patrol officer

23  conducted a traffic stop and identified the black male as Senegal and the black female as Woods.

24      d)  Further Investigation

25      Once he determined the identities of the individuals who were selling the marijuana,

26  Detective Grays conducted further investigation into Senegal and his apartment.  Detective Weber

27  confirmed that Senegal also had a separate media business that listed the Cambridge Street

28  apartment as the business address and confirmed that Senegal was a resident of the Cambridge

1  apartment in the Cambridge Street building.  There was no further information that anyone other

2  than Senegal, and perhaps Woods, were living in the apartment.

3        Detective Weber testified that the nature of the apartment building created a few different

4  obstacles for him to determine who exactly lived there and where the apartment was located.

5  First, the apartment building was a very large high rise apartment complex with all interior doors.

6  Second, an individual needed a programmable security card in order to access and enter the

7  building.  Detective Weber testified that his goal was to obtain a search warrant for Senegal's

8  unit, but that given these logistical obstacles he would have difficulty doing that.  As a result,

9  Detective Weber testified that he decided to conduct one last undercover purchase after which

10  Senegal and/or Woods would be arrested.  Detective Weber testified he was hopeful that after

11  taking them into custody, they would find some sort of evidence that tied back to their apartment

12  which would allow them to obtain a telephonic search warrant for the apartment. Detective Weber

13  testified as a last result they could conduct a consensual encounter at the apartment in an attempt

14  to obtain a telephonic search warrant for the apartment.

15       e)   <u>Fourth Transaction</u>

16        On December 15, 2018, a final controlled purchase was arranged.  Once again, this

17  transaction took place in a way that was almost identical to the previous transactions.  The parties

18  agreed to meet at the front valet area of the Silver Sevens Casino.  Once again Detective Grays

19  exited his vehicle and went over to the driver's side window to purchase a small amount of

20  marijuana.  After a brief conversation Detective Grays returned to his vehicle and left the area.

21  After the white Dodge exited the parking lot, a patrol vehicle pulled behind Senegal's vehicle and

22  conducted a vehicle traffic stop about a half mile from Senegal's apartment.  During the stop

23  Detective Weber made contact with Senegal and asked him a series of questions.  Detective

24  Weber testified that Senegal did not really answer his questions and was being evasive about the

25  Cambridge Street Apartments, his work history and his criminal history.

26        A second individual in the vehicle, Joel Robinson, was also detained during the stop.

27  Robinson gave a separate address that Weber testified was approximately a half mile away from

28  the Cambridge apartment where Senegal lived.  After running a record check on Robinson and

asking him questions regarding his involvement with Senegal, he was released.  Senegal was

arrested at the scene of the traffic stop and taken into custody.  During the course of the search of

the vehicle officers found a money gram receipt in Senegal's name for rent for the Cambridge

apartment.  Detectives also found a rent receipt for a storage unit that listed the Cambridge

apartment as the owner of the storage unit.  The name on the storage unit rent receipt was Albert

Howard.  Detective Weber testified he did not know who Albert Howard was nor did he do any

further investigation into Howard.

f) <u>Protective Sweep</u>

After arresting Senegal, Detective Weber and a second detective proceeded to the

Cambridge apartment in an attempt to conduct a consensual encounter at the apartment.

Detective Weber described a "consensual encounter" as knocking on the door, attempting to

make contact with anybody inside the apartment and determining if they were able to obtain

probable cause to get a search warrant.  Upon arriving at the apartment building Weber testified

that he and the other detective were able to enter through the secured main doors behind someone

else who had entered the lobby.  The Detective further testified that the leasing office was closed

and given the time of the evening they could not find a security guard or anyone else to assist

them in locating the apartment or otherwise further determining who lived there.  While in the

lobby, Detective Weber testified that Robinson, the individual who was with Senegal when he

was arrested, came toward the front doors of the building.  Upon seeing the detectives and

Detective Weber waiving his arms, Robinson turned around and walked the other way east back

away from the apartment complex and the Cambridge apartment.

Detective Weber and his partner proceeded up the elevator to the second floor in an

attempt to contact someone at the apartment.  When they exited the elevator bank, they followed

a sign that said the apartment was toward the west end of the building, opposite the way Robinson

left.  They began walking west through the hallway looking for the apartment and eventually

found it.  As they were approaching the apartment, they observed Woods walking out of the

apartment with a bag of trash and keys in her hands.  Upon confirming it was Woods, they

approached her and identified themselves as police officers.  Upon being asked for identifying

information, Woods initially provided Detective Weber with a false name.  According to

Detective Weber, Woods was somewhat evasive and indicated that she did not really know if

anybody else was inside the apartment, and that the apartment did not belong to her.  At that point

she was placed in handcuffs and told that she was under arrest.

After handcuffing Woods, Detective Weber and his partner moved a little away from the

door because they were unsure whether or not anybody else was inside the apartment.  After

moving Woods away from the apartment, Detective Weber's supervisor and other detectives

arrived from the car stop.  Shortly thereafter, the detectives conducted a "protective sweep" of the

apartment.  According to Detective Weber, his initial report stated the sweep was in anticipation

of obtaining a search warrant.  Once that was completed Detective Weber and the other officers

exited the apartment and began applying for a telephonic search warrant.

Detective Weber testified that the sweep took approximately 15 to 30 seconds and that

detectives went through the entire apartment looking anywhere a person might be able to hide or

conceal themselves.  Detective Weber indicated that they were not looking for any evidence at

that time, that they did not take any pictures at that time and that they did not seize any evidence

at that time.  According to Detective Weber, during the course of the "protective sweep"

detectives observed, in plain view, large amounts of marijuana, packaging materials such as green

pill bottles with the marijuana delivery line label on them like the ones obtained from the

previous transactions, open boxes containing packaging material for marijuana extracts, a rifle,

and U.S. currency.

g)  Application for Warrant

After the "sweep," Detective Weber applied for a telephonic search warrant.  All of the

evidence detectives observed during the sweep was included in the telephonic search warrant

affidavit, along with evidence related to the four undercover transactions and Senegal's criminal

history.  There was no information regarding Nevada's regulatory scheme for legal marijuana

delivery businesses in the telephonic search warrant.  After considering the information provided

to him during the telephonic warrant discussion, a Clark County Justice of the Peace (JP)

approved and signed the telephonic search warrant.  Thereafter, detectives returned to the

apartment and conducted the search.  During the search, the detectives seized the evidence they previously observed, including marijuana, packaging materials for the marijuana, a rifle and other evidence that Senegal now seeks to suppress.

## IV.     LEGAL ARGUMENT

### A.  Legality of the Protective Sweep of Senegal's Apartment Under the Fourth Amendment

Detective Weber testified that, in his report, which was completed shortly after the search of the apartment, the reason for entering the apartment was a protective sweep in anticipation of obtaining a search warrant. Detective Weber confirmed in his testimony that he did not indicate in the report that the search was either for officer protection or to ensure that no evidence was destroyed.  However, during the evidentiary hearing on the motion to suppress Detective Weber testified that officers conducted a sweep of the apartment to ensure that there were no other subjects inside the apartment who could conceal, remove or destroy any evidence that may be contained inside the apartment.  After further questioning from the prosecutor, Detective Weber also testified that in addition to ensuring that there were no other subjects inside the apartment who could remove or conceal or destroy any evidence, he also did the search of the apartment to confirm that there was no one inside the apartment who could pose a threat to anybody standing in the hallway.  At the conclusion of the evidentiary hearing, the Government abandoned Detective Weber's other reasons for the protective sweep of the apartment and argued the only justification for the sweep would be officer safety.  As a result, the court is tasked with deciding the reason for the alleged protective sweep given the inconsistent reasons provided.

A protective sweep is a quick and limited search of premises incident to arrest and conducted to protect the safety of police officers and others.  It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding. *Maryland v. Buie*, 494 U.S. 325, 327, 110 S. Ct. 1093, 1094 (1990).  For an officer to harbor a reasonable suspicion of danger there must be "articulable facts which taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id* at 334, 110 S.Ct. 1093.

Protective sweeps can occur inside a premise despite being predicated on an arrest that occurred outside of the premise, as is the case here. *See*, e.g., *United States v. Paopao*, 469 F.3d 760, 765-66 (9th Cir. 2006). In *Paopao*, police were investigating Paopao and another individual for a string of armed robberies of illegal gambling rooms. Police received a call from a confidential informant indicating both men from the earlier robberies were at a game room, an illegal gambling hall inside a three room apartment. As the officers approached the game room, a crowd of people flooded out the door including Paopao. Police ordered the crowd to lay on the ground and arrested Paopao. Fearing the second suspect was still inside, police swept the apartment for less than a minute. In upholding the search as a protective sweep, the Ninth Circuit outlined a number of detailed articulable facts which supported the officer's belief that the second suspect was inside the game room justifying the protective sweep. Based upon these articulable facts, the Ninth Circuit found that the fact that Paopao was arrested outside the game room did not automatically preclude the officers from conducting an appropriate sweep of the interior of the game room to protect themselves from the other suspect who was possibly inside. Thus, under the right set of articulable facts, it is clear that a protective sweep can occur inside a premise despite the arrest occurring outside the premise.

The Ninth Circuit also had an opportunity to address this issue in *United States v. Lemus*, 582 F. 3d 958 (9th Cir. 2009). In *Lemus*, police officers went to the defendant's house to arrest him on a warrant. Officers encountered the defendant outside his residence and told him they were there to arrest him. The defendant moved away from the officers toward a sliding glass door to the living room of his apartment. The officers arrested the defendant as he started to walk through the door. They then entered the apartment and conducted a protective sweep of all of the rooms. In justifying the search of Lemus' apartment as a protective sweep, the court found that under *Buie*, such a protective search can be conducted without probable cause or reasonable suspicion if two conditions are present: "First, the area searched must 'immediately adjoin' the area of arrest. Second, the area searched must be one 'from which an attack could be immediately launched' and thus in any event must be capable of concealing at least one person." *Lemus*, 582 F.3d at 963.

There is no question in this case that the area searched was not immediately adjoining the area of the arrest of Senegal. As Detective Weber testified, the area where he was arrested was some distance from the apartment complex and unit that was ultimately searched. Thus, in order for the search to be justified under a protective sweep, the officer's must harbor a reasonable suspicion of danger supported by articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene. *Buie,* 494 U.S. at 334. The Government attempts to justify the protective sweep using the totality of the circumstances, incorporating facts from the four transactions, facts from the scene of Senegal's arrest and facts from the scene of Woods' arrest. However, even considering the totality of the circumstances and the fact that Woods was arrested outside the Cambridge apartment, these facts do not justify the protective sweep.

The Government argues that the articulable facts justifying the protective search were that Woods was exiting the apartment carrying a bag full of garbage, was "shifty" and declined to refute that other people may or may not be in the apartment. The Government also argues that a piece of mail in the glove box of Senegal's vehicle was in the name ("Howard"); a different individual than Senegal, but had the same address as Senegal on the piece of mail. Finally, the Government argues that the other individual who was with Senegal at the time of his arrest, Robinson, was someone that they saw at the traffic stop and then again later heading toward the doors of the apartment complex. However, the testimony at the evidentiary hearing was that upon seeing the officers inside the apartment building, Robinson turned in a different direction than where the apartment was located and disappeared not to be seen again. The reason proffered by the Government (outlined at p 8 *supra*), was not necessarily adopted by Detective Weber during his testimony at the evidentiary hearing (where he testified it was originally in anticipation for a search warrant or to prevent the destruction of evidence), and did not justify the warrantless search of Senegal's apartment as a protective sweep.

Additionally, there is absolutely nothing that occurred during the four undercover purchases that would have provided officers with articulable facts which would justify a

protective sweep for officer safety.  The undercover officer who made the purchase never saw any weapons during the course of the transactions.  The transactions were relatively quick and routine.  At the time of the traffic stop after the third transaction, both Senegal and Woods were cooperative and provided information to the traffic officers.  Finally, at the time of the final transaction and the stop following the transaction, Senegal was cooperative and his arrest was uneventful.  No weapons were found on Senegal or in the vehicle at the time of his arrest.  After conducting a record check on the passenger Robinson, he was released.  Finally, upon reviewing the mail addressed to a different person that was found in Senegal's vehicle at the time of his arrest, officers did absolutely nothing to check on that individual, determine his identity, or whether or not that individual was involved whatsoever with the investigation or the apartment.  Thus, there are no articulable facts that taken together with rational inferences would support an officer believing the area swept harbored an individual posing a danger to those on the arrest scene.

Moreover, there is nothing regarding Woods exiting the apartment carrying a bag of garbage or the circumstances of her arrest at this scene that would indicate a danger.  Tellingly, detectives never even looked in the bag of garbage for weapons or evidence, so there clearly was nothing regarding Woods' actions at the time that they encountered her that gave them suspicion of either danger or destruction of evidence.  The mere fact that she was shifty during this initial contact and declined to refute the fact that people may or may not be in the apartment is not enough to give the officers a reasonable articulable suspicion that someone that might cause them danger might be hiding inside the apartment.  Indeed, an officer's lack of information about who is or is not in the home does not, on its own, justify a protective sweep.  *United States v. Colbert*, 76 F.3d 773 (6th Cir. 1996).

Finally, there was nothing else occurring at the scene of Woods' arrest that would give officers a reasonable suspicion that someone was inside the apartment.  They heard no further noise coming from the apartment, there was absolutely no credible evidence that anybody other than Woods or Senegal lived in the apartment, and there was nothing contemporaneously occurring that would justify a belief that there was a suspicion of danger.  As Detective Weber

1   stated in his original report and confirmed at the evidentiary hearing, his purpose for entering the

2   apartment on the night in question was in anticipation of a search warrant and not because of any

3   danger that they perceived at that specific time.  As such, the warrantless search of Senegal's

4   apartment was not justified as a protective sweep for officer safety and therefore violated

5   Senegal's Fourth Amendment right against unconstitutional searches and seizures.  Thus, the

6   observations of the officers from the pre-warrant sweep of the apartment should be excised from

7   the search warrant affidavit and the evidence should not be considered by the Court in

8   determining whether probable cause existed for the search.

9        **B.   After the Court Excises the Observations from the Protective Sweep from the**

10           **Affidavit There Are Insufficient Facts to Justify Probable Cause to Search the**

11           **Apartment**.

12       If an affidavit includes unconstitutionally acquired evidence, it does not automatically

13  invalidate the search warrant.  *United States v. Reed*, 15 F.3d 928, 933 (9th Cir. 1994).  The Court

14  must analyze whether, after excising the "tainted" evidence, the "remaining untainted evidence

15  would still provide a neutral magistrate with probable cause."  *Id.* (internal quotations omitted).

16  The facts remaining in the affidavit need not provide an exhaustive account of all information

17  related to the case.  Rather, "a reviewing court should excise the tainted evidence and determine

18  whether the remaining untainted evidence would provide a neutral magistrate with probable cause

19  to issue a warrant.  *United States v. Vasey*, 830 F.2d 782, 788 (9th Cir. 1987); *see also United*

20  *States v. Nora*, 765 F.3d 1049, 1068 (9th Cir. 2014).  This Court makes the probable cause

21  determination "without the usual deference owed to the magistrate's initial finding of probable

22  cause."  *Id*.  In their argument at the conclusion of the evidentiary hearing, the Government

23  concedes as much. (RT 139).  After redacting the information included in the affidavit that was

24  discovered as a result of the illegal protective sweep, the Court finds that there was not probable

25  cause contained in the affidavit to support the search of Senegal's apartment.

26       The Court adopts the redacted version of the search warrant affidavit proffered by the

27  defense in this case.  (*See* Exhibit A).  This includes removing the information regarding

28  Senegal's criminal history as it relates to the firearm that was discovered during the protective

1   sweep of the apartment.  The Government argues that the criminal history information should be

2   included in the redacted affidavit since that information was known to the detectives prior to the

3   protective sweep being conducted because the detectives ran a record check on Senegal shortly

4   after confirming his identity.  However, the Court finds this argument unpersuasive.

5          Based upon the evidence presented at the evidentiary hearing, the Court believes that

6   Detective Weber only included the criminal history information in the probable cause affidavit as

7   a result of him viewing a firearm inside the apartment during the protective sweep.  Detective

8   Weber prepared his affidavit in chronological order.  However, he did not include the criminal

9   history information in the affidavit chronologically as he supposedly discovered it.  He placed it

10  in the affidavit after he included the information discovered during the protective sweep,

11  including the gun.  Detective Weber states in the affidavit that being convicted of numerous

12  felonies, Senegal is prohibited from possessing a firearm such as the one that he saw during the

13  protective sweep of the apartment.  Given this, it is clear that but for seeing the firearm in the

14  apartment, Detective Weber would not have included criminal history information in the

15  affidavit, especially since Detective Weber did not include any information in the affidavit that

16  Senegal, as a convicted felon, would not be allowed to run a marijuana delivery service either.

17  As such, the Court will also excise the criminal history information from the affidavit.

18         Once the information obtained from the illegal protective sweep is redacted from the

19  affidavit for the probable cause determination, the affidavit does not establish probable cause that

20  Senegal's delivery service was illegal because it offers no facts to support that claim.

21  Importantly, running a marijuana delivery business is legal in the state of Nevada subject to

22  certain restrictions and licensing requirements.  *See*,

23  http://marijuana.nv.gov/businesses/gettingalicense/.  All that Detective Weber told the issuing

24  judge about the purported illegality of Senegal's business was the conclusory statement that he

25  had received information regarding an "illegal" delivery business.  Detective Weber provided no

26  further facts in the affidavit which would allow the issuing judge to conclude that there was

27  probable cause that the delivery service was violating the law.  Without this additional

28  information contained in the affidavit, this Court simply cannot infer that the issuing JP was

aware of these regulations and considered them in the context of the facts provided in the affidavit.

In their opposition to the motion to dismiss, the Government outlines numerous aspects of the Nevada Administrative Code that sets forth the requirements for legally qualifying marijuana delivery services and outlines how Senegal's actions violated these requirements. (ECF No. 33 at pp. 13-15). Unfortunately, none of this information is contained in the affidavit for the issuing JP's consideration. Had the information been contained in the affidavit for probable cause, this Court could have perhaps concluded that the JP was justified in issuing the warrant because various facts from the hand to hand transactions would seem to violate these regulations. However, this Court is confined to the four corners of the probable cause affidavit and cannot assume that the JP was aware of this information or otherwise considered it when finding probable cause. The magistrate judge must be provided with sufficient facts from which he may draw the inferences and form the conclusions necessary to a determination of probable cause. *Giordenello v. United States*, 357 U.S. 480, 485-86 (1958). The facts upon which the magistrate bases his probable cause determination must appear within the four corners of the warrant affidavit; the warrant cannot be supported by outside information. *United States v. Martinez*, 588 F.2d 1227, 1234 (9th Cir. 1978); *United States v. Anderson*, 453 F.2d 174 (9th Cir. 1971). Moreover, the Court cannot grant the JP's determination of probable cause "great deference" when it was based on facts that are no longer on the table. *See United States v. Kelley*, 482 F.3d 1047, 1051 (9th Cir. 2007); *see also United States v. Gaines*, 2013 WL 5533192, at *3 (D. Nev. Oct. 4, 2013).

Absent the regulations outlining what a legal marijuana delivery service must follow, the facts contained in the affidavit on their face alone do not establish that the delivery service was illegal or otherwise violated Nevada law. As such, the affidavit fails to establish probable cause to support the search of Senegal's apartment. The detective's conclusory allegations contained in the affidavit do not establish probable cause of a state law violation rendering the search warrant invalid.

1        **C. The Good Faith Exception Under *United States v. Leon* Does Not Apply in this**

2        **Case.**

3        Evidence obtained using an invalid search warrant is inadmissible unless some exception

4 to the exclusionary rule applies. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). The good faith

5 exception applies when an officer acts "in objectively reasonable reliance" on a later invalidated

6 warrant. *United States v. Leon*, 468 U.S. 897, 922 (1984). The Government bears the burden of

7 showing good faith. *United States v. Underwood*, 725 F. 3d 1076, 1085 (9th Cir. 2013).

8        Here, the Government argues that under the good faith doctrine, suppression is not

9 warranted because Detective Weber was acting on the objectively reasonable belief that he was

10 executing a valid warrant. However, under the facts of this case and taking into consideration

11 Detective Weber's actions both at the time he sought the search warrant and thereafter, the Court

12 finds this argument unpersuasive and declines to apply the good faith exception.

13        The Government falls well short of sustaining their burden of showing that Detective

14 Weber's actions were objectively reasonable under the totality of the circumstances. Moreover,

15 the good faith exception does not apply when the affidavit is bare bones, that is, so lacking in

16 indicia of probable cause as to render official belief in its existence entirely unreasonable. *Leon*,

17 468 U.S. at 922-923. As outlined above, the affidavit is a bare bones affidavit once the unlawful

18 information is excised from it. (*See* Exhibit A). Given that, the "bare bones" affidavit situation

19 applies in this case, and as explained in *United States v. Luong*, 470 F.3d 898 (9th Cir. 2006), the

20 court "need not inquire further" and can conclude that the good faith exception to the

21 exclusionary rule does not apply. 470 F.3d at 905.

22        Moreover, the officers' actions at the time they sought the search warrant and their actions

23 thereafter show that they were not objectionably reasonable under the circumstances. First, at the

24 time they sought the search warrant, officers described their purpose for their protective sweep as

25 "in anticipation of a search warrant." Not once did the officers indicate the protective sweep was

26 necessary for officer safety or to preserve evidence. Indeed, upon seeing Woods taking a bag of

27 trash out of the apartment, the officers neither searched the bag nor were under the opinion that

28 she was trying to destroy evidence. Additionally, at the time of the search, the contours of a

1    protective sweep were well established, and the circumstances of this search did not fall within

2    those contours.

3         There is no question the sweep of the apartment was in an effort to bolster the search

4    warrant, which would fly in the face of this Court allowing the evidence to be admissible under a

5    good faith exception.  More tellingly, nearly six (6) months after the search and after Senegal's

6    initial suppression motion was filed, Detective Weber filed a new addendum in which he attempts

7    to outline additional information that would support the protective sweep of the apartment and the

8    information contained in the affidavit for probable cause.  While the Government proffered

9    testimony at the evidentiary hearing attempting to explain this addendum (via Sergeant Cutolo),

10   the Court finds this evidence less than persuasive.  If anything, filing this addendum at such a late

11   date given the procedural status of the case indicates an acknowledgement by the detective that

12   there were issues with his affidavit for probable cause and the search warrant.  *See United States

13   v. Reinholz*, 245 F.3d 765, 775 (8th Cir. 2001) ("retroactively supplementing the affidavit with

14   material omissions bolstering probable cause would undermine the deterrent purpose of the

15   exclusionary rule."); *see also* 2 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth

16   Amendment § 4.4 (4th ed.) (adding information to the original affidavit is appropriate only as to

17   omit information tending to cast some doubt on probable cause otherwise shown).

18        When taken into consideration with all of the other facts and circumstances related to the

19   investigation and the probable cause affidavit, the Court finds that applying the good faith

20   exception outlined in *Leon* would not be appropriate in this case.  As such, the Court declines to

21   apply a good faith exception to the exclusionary rule in this instance.  Therefore, it will

22   recommend that the evidence found during the search of Senegal's apartment be suppressed as

23   fruits of an illegal search.

24        **V.    CONCLUSIONS AND RECOMMENDATON**

25        IT IS THEREFORE RECOMMENDED that Defendant Senegal's Motion to Suppress

26   Evidence (ECF No. 32) be GRANTED.

27

28

1

## VI.    NOTICE

2      This report and recommendation is submitted to the United States District Judge assigned

3  to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this report and recommendation

4  may file a written objection supported by points and authorities within fourteen days of being

5  served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely

6  objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d

7  1153, 1157 (9th Cir. 1991).

8      DATED: December 20, 2019

9

10                                          _____
                                            DANIEL J. ALBREGTS
                                            UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

Event #: LLV 181200069720

FILED

# DUPLICATE ORIGINAL SEARCH WARRANT
## N.R.S. 179.045

2019 JAN -3 P 3: 59

0045

| STATE OF NEVADA | } | |
| | } ss. | JUSTICE COURT |
| COUNTY OF CLARK | } | LAS VEGAS NEVADA |
| | | BY |
| | | DEPUTY LG |

The State of Nevada, to any Peace Officer in the County of Clark. Proof having been made before me by Detective D. Weber, P# 14457, by oral statement given under oath, that there is Probable Cause to believe that certain evidence, to wit:

A. Any and all controlled substances to include, but not limited to marijuana:

B. The paraphernalia commonly associated with the ingestion and distribution of the controlled substance [Drug(s)], such as scales, packaging material, and cut, grinders customer and source lists, recordations of purchases and sales, including owe sheets, cellular telephones, and digital pagers reflecting transactions in the controlled substance marijuana.

C. Any and all firearms to include, but not limited to a black rifle.

D. All firearm accessories to include, but not limited to holsters, cleaning kits, gun parts, magazines and ammunition.

E. Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility receipts, or addressed envelopes.

F. U.S. currency believed to be from the sale of marijuana.

Is presently located at ███ Cambridge Street, apartment ██, Las Vegas, Clark County, Nevada ███

And as I am satisfied that there is Probable Cause to believe that said evidence is located as set forth above and based upon the statements of Detective D. Weber, there are sufficient grounds for the issuance of this Search Warrant.

You are hereby commanded to search said premise for said property, serving this warrant between 7am and 7 pm, and if the property is there to seize it and leave a written inventory and make a return before me within ten days.

Dated this ___15th___ day of ___December___, ___2018___ at ___2305___ Hours.

HONORABLE JUDGE J. BONAVENTURE
Judge Bonaventure
Signed by Detective D. Weber, P# 14457 :

Acting upon the oral authorization of the Honorable Judge Bonaventure

Witnessed by Detective J. Peacock, P# 8276    18276P

Endorsed this ___31st___ day of ___December___, 20 __18__

Judge Bonaventure

RECEIVED

DEC 2 1 2018

LAS VEGAS JUSTICE COURT

Page 1 of 1

**Event #: LLV 181200069720**

# DUPLICATE ORIGINAL SEARCH WARRANT
## N.R.S. 179.045

STATE OF NEVADA           }
                          } ss.
COUNTY OF CLARK           }

The State of Nevada, to any Peace Officer in the County of Clark. Proof having been made before me by Detective D. Weber, P# 14457, by oral statement given under oath, that there is Probable Cause to believe that certain evidence, to wit:

A. Any and all controlled substances to include, but not limited to marijuana.
B. The paraphernalia commonly associated with the ingestion and distribution of the controlled substance [Drug(s)], such as scales, packaging material, and cut, grinders customer and source lists, recordations of purchases and sales, including owe sheets, cellular telephones, and digital pagers reflecting transactions in the controlled substance marijuana.
C. Any and all firearms to include, but not limited to a black rifle.
D. All firearm accessories to include, but not limited to holsters, cleaning kits, gun parts, magazines and ammunition.
E. Limited items of personal property which would tend to establish a possessory interest in the items seized pursuant to this search warrant, such as personal identification, photographs, utility receipts, or addressed envelopes.
F. U.S. currency believed to be from the sale of marijuana.

Is presently located at ▮▮▮ Cambridge Street, apartment ▮▮▮, Las Vegas, Clark County, Nevada ▮▮▮▮▮

And as I am satisfied that there is Probable Cause to believe that said evidence is located as set forth above and based upon the statements of Detective D. Weber, there are sufficient grounds for the issuance of this Search Warrant.

You are hereby commanded to search said premise for said property, serving this warrant between 7am and 7 pm, and if the property is there to seize it and leave a written inventory and make a return before me within ten days.

Dated this ___15th___ day of _____December_____ , __2018__ at __2305__ Hours.

_____
Judge Bonaventure
Signed by Detective D. Weber, P# 14457 :              _____
Acting upon the oral authorization of the Honorable Judge Bonaventure

Witnessed by Detective J. Peacock, P# 8276         _____

Endorsed this _____ day of __December_____ , 20 _18_ .

_____
Judge Bonaventure

Page 1 of 1



SW2019 0045

# FILED

**Event #: LLV 181200069720**

## NARCOTICS BUREAU SEARCH WARRANT DECLARATION

2019 JAN -3 P 3:59

JUSTICE COURT
LAS VEGAS NEVADA

BY ___

SW2019-0045
SW
Search Warrant
10373394

| | | |
|---|---|---|
| Detective D. Weber | | LVMPD Event# 181200069720.  Judge Bonaventure, for the record this line is being recorded.  Do I have your permission to continue? |
| Judge Bonaventure | : | Yes. |
| Detective D. Weber | : | This is Detective D. Weber, P# 14457, of the Las Vegas Metropolitan Police Department, Narcotics Bureau, and I am making an application for a Telephonic Search Warrant pursuant to N.R.S. 179.045.  I am talking to Judge Bonaventure.  The date is December 15th, 2018, and the time of this call is 2305 hours.  Judge Bonaventure, could you please swear me in? |
| Judge Bonaventure | : | Please raise your right hand.  Do you swear to tell the truth, the whole truth and nothing but the truth? |
| Detective D. Weber | : | I do. |
| Judge Bonaventure | : | Thank you. |

Detective D. Weber:

Judge Bonaventure, my application is as follows:

I, Detective D. Weber, P# 14457, am employed by the Las Vegas Metropolitan Police Department and have been so employed for the period of 7 years.  I'm currently assigned to the Narcotics Bureau and have been assigned to this detail for approximately 1 year.

I am presently investigating the crimes of Sale of a Controlled Substance Marijuana and Conspiracy to Violate the Uniformed Control Substance Act, which is presently occurring at ███Cambridge Street, apartment ███ Las Vegas, Clark County, Nevada█████.

**There is probable cause to believe that certain property hereinafter described will be found at the following described premises, to wit:**

RECEIVED

DEC 2 1 2018

LAS VEGAS JUSTICE COURT

RECEIVED IN JUSTICE COURT
DEPARTMENT 9 CHAMBERS ON

DEC 2 6 2018

Page 1 of 8

Event #: LLV 181200069720

1. ███ Cambridge Street, apartment ███, Las Vegas, Clark County, Nevada ███ The premise is further described as a multi-family dwelling located within the complex commonly known as Prime Living. The multi-story structure is white in color having purple, turquoise and yellow accents. The numbers ███ are black in color on a white background and are located approximately 7 stories high on the south part of the building facing south. The door of the residence is purple in color and faces south. The numbers ███ are on a placard to the right of the door and affixed to the wall at eye level.

2. Epithelial cells from the mouth of last name Senegal, Sam-Easy-Nora-Easy-George-Adam-Lincoln, first name Louis, Lincoln-Ocean-Union-Ida-Sam, ID# 2624915, to be collected via buccal swab. Senegal is currently in custody at ███ Sierra Vista Drive, Las Vegas, Nevada ███.

**The property referred to and sought to be seized consists of the following:**

1. Any and all controlled substances to include, but not limited to marijuana.
2. Paraphernalia commonly associated with the ingestion and distribution of the controlled substance marijuana, such as scales, baggies, packaging materials, cut/grinders, owe sheets, customer and source lists, and recordations of purchases and sales.
3. Any and all firearms to include, but not limited to a black rifle.
4. All firearm accessories to include but not limited to holsters, cleaning kits, gun parts, magazines and ammunition.
5. U.S. currency believed to be proceeds from the sales of marijuana.
6. Epithelial cells from the mouth of last name Senegal, first name Louis, ID# 2624915, to be collected via buccal swab.
7. Articles of personal property which would tend to show possession, dominion and control over said premises such as personal identification, photographs, utility company receipts or addressed envelopes.

The items sought to be seized constitute evidence which would tend to show the identity of persons responsible for the crimes of Sales of a Controlled Substance Marijuana and Conspiracy to Violate the Uniformed Controlled Substance Act, as set forth in this affidavit.

**In support of the assertion to constitute the existence of probable cause, the following facts are offered.**

During the month of November 2018, I, Detective D. Weber, P# 14457, hereinafter referred to as your affiant, received information regarding a illegal marijuana delivery

**Event #: LLV 181200069720**

service advertising itself as "The Marijuana Delivery Line" with a listed address of  Cambridge and listed a contact number of 702-███ as a contact number to place orders. Based on this information your affiant initiated a narcotics investigation.

On November 29th, 2018, your affiant directed Detective A. Grays, P# 9696, to contact telephone number 702-███ to attempt to order a quarter ounce of marijuana. An unknown male answered the phone and agreed to meet Detective Grays at ███ Paradise Road, Las Vegas, Nevada ███

On November 29th, 2018, at approximately 1452 hours, Detective Grays was contacted by an unknown female who tells him to meet her near the front doors. An unknown black female approaches Detective Grays' vehicle and provides Detective Grays two green pill bottles containing purported marijuana. The two green pill bottles contained a label on the outside inscribed "MDL" (short for Marijuana Delivery Line) which were placed vertically along the pill bottle.

The unknown black female provided Detective Grays the two green pill bottles of purported marijuana in exchange for $100.00 in pre-recorded LVMPD buy money. The purported marijuana later test ODV positive and weighed 10.1 gross grams.

On December 5th, 2018, Detective Grays contacted telephone number 702-███ and ordered a half ounce of marijuana. On December 5th, 2018, under LVMPD Event# 181200022567, at approximately 2140 hours, Detective Grays was contacted by telephone number 702-███ at which time, a unknown male told Detective Grays he was parked near the front entrance in a white Dodge Charger.

Detective Grays then made contact with the white Dodge Charger, bearing Nevada plate of Lincoln-Victor-Lincoln-5-0-Union. The unknown black male handed Detective Grays 4 green plastic pill bottles with the same label inscripted on the outside as the previous deal. The green pill bottles contained the purported marijuana and Detective Grays provided the unknown male with $150.00 in pre-recorded LVMPD buy money. Afterwards Detective Grays informed your affiant that the female from the previous deal was in the passenger seat of the white Dodge Charger with the unknown male Detective Grays had just interacted with.

At the conclusion of the buy your affiant, along with fellow detectives, conducted mobile surveillance on the white Dodge Charger as it exited ███ Paradise Road and entered into the complex located The Prime Apartments located at ███ Cambridge Street, Las Vegas, Nevada ███.

**Event #: LLV 181200069720**

Detectives observed the vehicle travel to the north end of the complex; at which time, the black female from the first deal exited the vehicle and entered the complex. The unknown black male driving the vehicle then traveled down to space 7 and parked his vehicle; at which time, he exited the vehicle and entered the apartment building. The purported marijuana later test ODV positive and weighed 17.4 gross grams.

Your affiant then conducted a records check of the Charger and learned that the registered owner was a last name of Senegal, first name Louis, date of birth ████1978. The records check of the vehicle also revealed that the registration was suspended.

On December 13th, 2018, Detective Grays contacted the Marijuana Delivery Line at telephone number 702-████████ and ordered a half ounce of marijuana. The unknown male on the other side of the phone agreed to meet Detective Grays at ████Paradise Road. On December 13th, 2018, at approximately 1959 hours, under LVMPD Event# 181200059684, Detective Grays was again contacted by telephone number 702-████ ████; at which time, Detective Grays was told that the male was waiting near the front doors in the white Charger. Detective Grays then met with the unknown male and female in the white Dodge Charger, bearing Nevada plate Lincoln-Victor-Lincoln-5-0-Union; at which time, the black male provided Detective Grays with 4 of the same green pill bottles containing purported marijuana in exchange for $150.00 in pre-recorded LVMPD buy money.

Your affiant, along with fellow detectives, then conducted mobile surveillance as the white Dodge Charger exited the parking lot until patrol officers were able to conduct a stop on the white Charger for the suspended registration. During this stop, the patrol officers identified the male driver to be first name Louis, last name Senegal, date of birth 1████ 1978. And the female passenger to be first name Easy-Nora-David-Yellow-Adam-Henry, last name Woods, date of birth ████1998.

The purported marijuana Detective Grays purchased later tested ODV positive and weighed 17.6 gross grams. Your affiant then obtained photographs of Senegal, first name Louis, ID# 2624915, and last name Woods, first name Endyah, ID# 7046909, and provided them to Detective Grays to confirm that Woods and Senegal are the subjects who have been selling Detective Grays the marijuana.

Your affiant then learned that Senegal is listed as the CEO of Massive Global Media. Your affiant then conducted a check of Massive Global Media through open sources and learned the company address is listed as ████ Cambridge, apartment #217, with a business phone number of 702-████████which is the same number that has contacted Detective Grays on the previous 2 deals.

**Event #: LLV 181200069720**

On December 15th, 2018, Detective Grays contacted the Marijuana Delivery Line at telephone number 702-███████ and ordered a half ounce of marijuana. Senegal agreed to meet at the same location as the previous 3 deals. On December 15th, 2018, at approximately 1945 hours, under LVMPD Event# 181200069003, Detective Grays met with Senegal; at which time, Senegal provided Detective Grays a clear plastic pill bottle containing purported marijuana in exchange for $150.00 in pre-recorded LVMPD buy money. The purported marijuana later test ODV positive and weighed 16.9 gross grams.

Upon Senegal leaving the parking lot, patrol officers conducted a vehicle stop on Senegal and took him into custody for Sales of a Controlled Substance Marijuana and Conspiracy to Violate the Uniform Controlled Substance Act. While fellow detectives were handling the vehicle stop, Detective Peacock, P# 8276, and your affiant went to Prime located at ███ Cambridge to conduct a knock and talk at apartment ███.

Prior to conducting a knock and talk, your affiant observed Woods exiting apartment ███. Your affiant then made contact with Woods and confirmed her identity. Upon confirming Woods' identity, your affiant placed her under arrest for Sales of a Controlled Substance Marijuana and Conspiracy to Violate the Uniform Controlled Substance Act.



Your affiant knows through my training and experience those actively engaged in the illegal sales of narcotics typically do not carry a large quantity of narcotics on their person, but maintain the larger quantities in their residence and only carry small amounts for pre-determined deals.

Judge Bonaventure: Officer, are you prepared to keep going?

Detective D. Weber: Yeah, I'm sorry. I'm just tryin'…one second.

Event #: LLV 181200069720



As an experienced Narcotics detective I have conducted and assisted in dozens of investigations involving narcotics. Based on my training and experience narcotics dealers and those who use illegal narcotics maintain records of their dealings and use. They also commonly have items such as scales, pipes, cut/grinders and owe sheets. These items would be valuable in proving the crimes associated with the illegal use and sale of the controlled substances.

Your affiant prays this search warrant authorize a night time search for the following reason. Night service is necessary because my training and experience indicates that the longer a search of this type is delayed the greater the chance that physical evidence

**Event #: LLV 181200069720**

such as potentially fragile or fleeting trace evidence will diminish in evidentiary value. The location is currently frozen and both subjects are in custody.

If unable to obtain a search warrant, the subjects may be able to contact somebody else to remove evidence in the near future. The evidence of dominion and control as described as necessary in establishing dominion and control over the premises and often assists in identifying the perpetrator prior to the crime. Such evidence is normally left or maintained upon premises and/or by those who are in control of said premises which would include those visiting such premises. Information such as personal identification, photographs, utility company receipts, or addressed envelopes may disclose the information about the crime being investigated.

Judge Bonaventure, this ends the probable cause details. Do you want me to read the Duplicate Original Search Warrant?

| | | |
|---|---|---|
| Judge Bonaventure | : | No. |
| Detective D. Weber | : | Judge Bonaventure, do you find that probable cause exists for the issuance of a search warrant? |
| Judge Bonaventure | : | Yes, I do find probable cause. |
| Detective D. Weber | : | Judge Bonaventure, do you authorize a night time search clause? |
| Judge Bonaventure | : | Yes, I do. |
| Detective D. Weber | : | Judge Bonaventure, do I have your permission to affix your name to the Duplicate Search Warrant? |
| Judge Bonaventure | : | Yes. |
| Detective | : | This application and the signing of the Search Warrant were witnessed by Detective J. Peacock, P# 8276. Judge Bonaventure, this ends our conversation. Thank you for your time. |
| Judge | : | You're welcome. |
| Detective | : | Time is 2325 hours. This ends the recording. |

**Event #: LLV 181200069720**

S. Collins, P# 4944, Transcriber

I certify that this is a true and accurate transcription.

Dated this ___17th___ day of ___December___, ___2018___ at ___1546___ hours.

Detective D. Weber, P# 14457, Narcotics Bureau

"Having read the transcription of the Telephonic Search Warrant issued by this Court on 12-15-18, under Event# 181200069720, with Detective D. Weber, P# 14457, of the LVMPD serving as affiant and having reviewed the recording of the application, it appears the transcription is accurate."

Judge Bonaventure

181200069720

Page ___1___ of ___1___

# FILED RETURN

(Must be made within 10 days of issuance of Warrant)

2019 JAN -3 P 3:59

JUSTICE COURT
LAS VEGAS NEVADA

DEPUTY

SW2019 __0045__

LG

The Search and Seizure Warrant authorizing a search and seizure at the following described location(s):

_____ CAMBRIDGE ST. ████ LV, NV

was executed on _____ DECEMBER 15TH, 2018 _____
(month, day, year)

A copy of this inventory was left with ___ PLACE OF SEARCH ___

(name of person or "at the place of search")

The following is an inventory of property taken pursuant to the warrant:

- U.S. CURRENCY

- MARIJUANA

- PACKAGING MATERIALS

- MONEY COUNTER

- THC LIQUID

- POSSESSORY PAPERWORK

- MISC. AMMUNITION

- ANDERSON MANUFACTURING AM15  #14038246
  .223 RIFLE

- SPRINGFIELD X.D. .40 HANDGUN  #309393

- DAVIS INDUSTRIES .380 HANDGUN # AP370753

- GUN BOXES

This inventory was made by: _____ D14457W _____ J8276P _____

RECEIVED

; 2 1 2018    (at le...                                ...om whom property is taken is present include that person.)

LVMPD 718 (REV. 5-04)    LAS VEGAS JUSTICE COUR.

SW2019 - 0045
RD
Return Date (Officer Execution Date)
10373393

SW2019 __0045__

Page __1__ of __1__

14120069720

## FILED

## RETURN
(Must be made within 10 days of issuance of Warrant)

2019 JAN -3 P 3: 59

JUSTICE COURT
BY
LG

The Search and Seizure Warrant authorizing a search and seizure at the following described location(s):

THE BODY OF SENEGAL, LOUIS ID# 2624915 WHO IS IN CUSTODY AT _____ SIERRA VISTA DR LAS VEGAS, NV _____

was executed on _____12-16-18_____
(month, day, year)

A copy of this inventory was left with _____
_____AT PLACE OF SEARCH_____
(name of person or "at the place of search")

The following is an inventory of property taken pursuant to the warrant:

- EPITHELIUM CELLS FROM THE MOUTH OF SENEGAL, LOUIS ID# 2624915 ~~TO AC~~

This inventory was made by: ___M. FRANCO 17816___
J. CAMERON 9326
(at least two officers including affiant if present. If person from whom property is taken is present include that person.)

RECEIVED

DEC 2 1 2018

LAS VEGAS JUSTICE COURT